

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. WR-81,574-02

---

### Ex Parte ARELI ESCOBAR, Applicant

---

### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### CAUSE NO. D-1-DC-09-301250-B IN THE 167TH JUDICIAL DISTRICT COURT
### TRAVIS COUNTY

---

**KELLER, P.J., delivered the opinion of the Court in which YEARY, KEEL, SLAUGHTER and MCCLURE, JJ., joined. RICHARDSON, J., concurred. HERVEY, NEWELL and WALKER, JJ., dissented.**

### <u>OPINION</u>

The United States Supreme Court remanded this case to us to reconsider Applicant's false-testimony claim in light of the State's confession of error. After receiving a motion suggesting that the parties had evidence not previously considered in these habeas proceedings, we held the case for 30 days to allow supplementation of the record. Applicant filed supplemental materials with a cover sheet that lists five items. He has failed to comply with the applicable appellate rule because he does not explain the significance of any of these items or why they could not have been filed earlier, but we will, nevertheless, consider the new material. Upon consideration, we conclude that the new material does not change our original assessment of Applicant's false-testimony claim.

And after considering the arguments made by the parties on *certiorari*, we conclude that they add nothing to what we were already aware of when we denied relief. As for the State's change in position, we were aware that the State was no longer defending the conviction when we originally denied relief, and we were aware that the State was actively supporting Applicant's request for relief when it afterwards filed its suggestion that we reconsider the case. Nothing presented in the *certiorari* proceedings or to us afterwards changes our conclusion that Applicant has not shown a due process violation; because he has not shown certain evidence to be false, and other evidence that has been shown to be false is not material because there is no reasonable likelihood that the outcome would have changed if the false evidence had been replaced with accurate evidence. Accordingly, we reaffirm our denial of relief.

## I. BACKGROUND

### A. Conviction, Appeal, and First Application

Applicant was convicted of capital murder for murdering seventeen-year-old Bianca Maldonado Hernandez in 2009 in the course of committing or attempting to commit aggravated sexual assault. Pursuant to the jury's answers to the special issues, he was sentenced to death. We affirmed his conviction on direct appeal.[1] On May 30, 2013, he filed his initial post-conviction habeas application. We denied relief.[2]

### B. Allegations in Second Application

Applicant later filed a second post-conviction habeas application. This application made the

---

[1] *Escobar v. State*, No. AP-76,571, 2013 WL 6098015 (Tex. Crim. App. Nov. 20, 2013) (not designated for publication).

[2] *Ex parte Escobar,* No. WR-81,574-01, 2016 WL 748448 (Tex. Crim. App. February 24, 2016)(not designated for publication).

following claims:

(1) that he was entitled to relief under the statutory "new science" writ[3] on the basis that DNA evidence relied upon by the State for conviction was scientifically unreliable,

(2) that his right to due process was violated by unreliable, misleading, and false DNA evidence relied upon by the State for conviction,[4]

(3) that his right to due process was violated by the State's failure to disclose problems with the Austin Police Department DNA lab,[5]

(4) that he was entitled to relief under the statutory "new science" writ on the basis that fingerprint evidence relied upon by the State for conviction was scientifically unreliable,

(5) that his right to due process was violated by the State's failure to disclose exculpatory evidence regarding the fingerprint testimony at trial, along with other disclosure violations, and

(6) that his right to due process was violated by misleading and false testimony concerning cell phone and cell tower records.

## C. Remand for Merits Determinations

Because his second application was a subsequent application, each claim needed to satisfy a statutory exception to the subsequent-application bar before consideration of the merits would be permitted.[6] We concluded that claims one through four alleged prima facie facts sufficient to satisfy an exception, to the extent that they invoked the statutory "new science" writ as a new legal basis

---

[3] TEX. CODE CRIM. PROC. art. 11.073.

[4] He cited *Napue v. Illinois*, 360 U.S. 264 (1959) and *Ex Parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009). Applicant did not contend that the State knowingly used false evidence but relied upon Texas caselaw, based on *Chabot*, holding that a due-process violation could be based on the State's unknowing use of false evidence.

[5] *See Brady v. Maryland*, 373 U.S. 83 (1963).

[6] *See* TEX. CODE CRIM. PROC. art. 11.071, § 5.

for relief.[7]  We also concluded that a part of claim six alleged facts that were prima facie sufficient to satisfy an exception.[8]  Consequently, we remanded those five claims to the convicting court for consideration of the merits.[9]

### D. State's Answer, Findings, and State's Subsequent Response

In an answer by District Attorney Margaret Moore, the State contended that all of the remanded claims were without merit.  The convicting court entered findings of fact and conclusions of law recommending that relief be granted on claims one and two and that relief be denied on the remaining claims.[10]

In January of 2021, a new District Attorney, José Garza, filed a document that objected to numerous findings and conclusions made by the convicting court and that abandoned certain earlier proposed findings and conclusions sponsored by the State.  Most of the document detailed the State's objections to various parts of the convicting court's findings.  In two sentences spanning the fifth and sixth pages of the document, the State said, "Other than these objections, the State expresses no opposition to the remainder of the Court's findings and conclusions.  Further, the State does not object to the Court's 'Conclusion and Recommendation' on page 86."  In the concluding sentence

---

[7] *Ex parte Escobar,* No. WR-81,574-02, 2017 WL 4675538 (Tex. Crim. App. October 18, 2017)(not designated for publication).  In his application, Applicant asserted that his due-process false-evidence claim was based on new evidence not available when he filed his previous application—Texas Forensic Science Commission audit findings in June 2016 and an August 2016 Mitotyping report.  Our remand order was not based on this claimed exception.

[8] *Id.* (citing TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(2)).

[9] *Id.*

[10] Regarding the false-evidence claim, the convicting court made no finding that the use of the false evidence by the State was "knowing" but relied on Texas caselaw for the proposition that knowing or unknowing use by the State was irrelevant.

of the document, on page thirteen, the State said, "Except regarding those matters covered by the State's objections above, to the extent the State's proposed findings of fact and conclusions of law deviate from the findings of fact and conclusions of law signed by the trial court, the State abandons those proposed findings and conclusions." The sentences we have cited on pages five, six, and thirteen were the only sentences suggesting that the State had changed its position on the merits of Applicant's claims, and no reason was given for this change in position.

### E. Our Order Disposing of Second Application

We agreed with the convicting court that claims three, four, and six should be denied.[11] But we disagreed with its recommendation to grant relief on claims one and two.[12]

With regard to claim one, the "new science" claim, we concluded that Applicant had not shown that the general deficiencies discovered in an audit of the Austin lab specifically affected the DNA results in his case.[13] We further concluded that, although statistical probability estimates for certain mixed DNA samples were incorrectly calculated, correctly calculated statistics for some of the mixed samples still inculpated Applicant, and there were two inculpatory single-source DNA results unaffected by the flaws in mixed-sample interpretation.

We concluded that even if correctly calculated DNA statistics and evidence undermining the reliability of the DNA samples had been presented at trial, Applicant had not shown by a

---

[11] *Ex parte Escobar,* No. WR-81,574-02, 2022 WL 221497, *4 (Tex. Crim. App. January 26, 2022)(not designated for publication).

[12] *Id.* at *2-3.

[13] *Id.* *3.

preponderance of the evidence that he would not have been convicted.[14] We observed that the State

had presented other evidence to support Applicant's conviction, including:

> • a latent print on a lotion bottle,

> • cell phone evidence,

> • a shoe print,

> • testimony from Applicant's girlfriend overhearing on her cell phone the sound of Applicant having sex with someone, and

> • Applicant's statements and appearance after the offense. Applicant variously stated that he had "fucked up some woman," that he had a fight with "some asshole," that he had "f-ed up" and that some girl's blood was on his clothes, and that he had sex with a girl early that morning but did not hurt the girl.

With regard to claim two, the false-evidence claim, we concluded that there was not a

reasonable likelihood that the false evidence affected the judgment of the jury.[15] We concluded that

any falsity with respect to the DNA results was not material because properly calculated DNA results

still inculpated Applicant.[16] We also noted the State's reliance on the girlfriend's testimony,

eyewitness accounts of Applicant's statements and appearance after the offense, and the cell phone,

fingerprint, and shoe print evidence.[17] Given the combined strength of the State's evidence, we

concluded that Applicant failed to show a reasonable likelihood that the challenged evidence affected

the jury's judgment.[18]

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

We dismissed claim five for failing to satisfy an exception to the subsequent-application bar.[19]

### F. State's Suggestion for Reconsideration

The State subsequently filed a suggestion for reconsideration on the Court's own motion. In that document the State expressed its agreement with the convicting court that Applicant is entitled to relief under claims one and two. The State expressed a concern "that it did not clearly illuminate its changed position from initially opposing relief to ultimately that of supporting relief for the Applicant." The State thought it was possible that it had failed to clearly indicate its changed position because we did not acknowledge in our prior order that the State had conceded that Applicant was entitled to relief. The State then said:

> The State has much to offer this Court in terms of analysis of the facts, the law, and the failures in the forensic science that supported the conviction, but procedurally could only provide a brief if this court requests it.

The State then requested that the Court file and set the case, order briefing, and issue a full opinion acknowledging the entirety of the record. We denied the State's request without written order.

### G. *Certiorari* Proceedings

Applicant advanced his false-evidence claim in a petition for writ of *certiorari* to the United States Supreme Court. In addition to arguing the substance of his claim, Applicant also pointed to the fact that the convicting court and the State agreed that he was entitled to relief. He further pointed out that we denied relief without acknowledging the State's position.[20]

In a response to the petition, the State conceded error. The State said that after the convicting

---

[19] *Id.* at *4.

[20] Applicant also filed a reply brief, expounding more upon his claim.

court issued its findings, "the District Attorney initiated a wholesale review of the habeas record and reexamined the State's position regarding each of Petitioner's claims."[21] In particular, the State said it found troubling "evidence adduced postconviction that exposed contamination issues within the APD Lab, some bearing upon the processing of the evidence in this case."[22] The State addressed other aspects of the case, consistent with Applicant's petition.

The Supreme Court granted *certiorari*, vacated our prior judgment, and remanded the case for further consideration in light of the State's confession of error in its response to Applicant's petition.[23]

### H. Remand from Supreme Court

On March 1, 2023, this case was set for submission on remand from the Supreme Court. Applicant subsequently filed an agreed motion to stay proceedings and postpone submission pursuant to Texas Rule of Appellate Procedure 73.7. He asserted that the State of Texas "located evidentiary materials in its files that tended to further negate Mr. Escobar's guilt and/or highlight the materiality of the discredited forensic evidence used to convict him" and that the State has disclosed over 700 additional electronic files containing discovery. He also pointed to a recently published article by the National Institute of Standards and Technology (NIST) that he contends relates to issues of DNA transfer and contamination and the interpretation of DNA mixtures. Due to continued investigation and "ongoing *Brady* disclosures," he contended that "the writ record currently before

---

[21] *See Escobar v. Texas*, No. 21-1601, BRIEF OF RESPONDENT STATE OF TEXAS IN SUPPORT OF PETITIONER, at 12 ("State's cert. response").

[22] *See id.* at 13.

[23] *Escobar v. Texas*, 143 S.Ct. 557 (2023).

this Court is incomplete."

He requested that the proceedings before us be stayed to permit the parties to file additional evidence relevant to whether Applicant's conviction can survive notwithstanding constitutional error. He asked that the case be remanded to the convicting court for 90 days "to allow for continued investigation and fact development in the form of the submission of additional relevant and exculpatory evidence, including expert opinion applying the NIST report principles to the evidence in this case, and potential further proceedings . . . and supplemental findings of fact."

On April 5, 2023, we issued an order to "hold this application on our own motion for thirty days."[24]  We further stated, "Should Applicant supplement the record in the trial court with evidentiary materials, the district clerk shall immediately forward these materials to this Court as a supplemental record."[25]  We dismissed Applicant's stay motion.[26]

Applicant subsequently supplemented the record in the trial court.  He included a one-page document, titled "notice" of supplemental evidentiary materials, that enumerated five items.  In its entirety, the notice enumerated and described the items as follows:

1. Affidavit of Jenna Fechner, dated April 12, 2023;

2. Declaration of Simon Ford, Ph.D., dated May 2, 2023;

3. Declaration of Dan E. Krane, Ph.D., dated December 23, 2022;

4. Declaration of Keith Inman, dated December 18, 2022;

---

[24] *Ex parte Escobar,* No. WR-81,574-02 (Tex. Crim. App. April 5, 2023)(not designated for publication).

[25] *Id.*

[26] *Id.*

5. Law enforcement records relating to the prosecution of Fernando Garcia-Sanchez for the crime of Aggravated Robbery on December 10, 2010.

## II. ANALYSIS

### A. Supplementation

Rule of Appellate Procedure 73.7, which Applicant relied on as authority to supplement the record in the convicting court, provides in relevant part:

> If an Article 11.07 or 11.071 application has been forwarded to this Court, and a party wishes this Court to consider evidence not filed in the trial court, then the party must comply with the following procedures or the evidence will not be considered.
> * * *
> (a) If the Court of Criminal Appeals has received an Article 11.07 or 11.071 application from the district clerk of the county of conviction and has filed and set the application for submission,
> * * *
> (2) The party may file in the Court of Criminal Appeals a motion to supplement the record in the trial court. In this motion, the party should describe the evidence the party intends to file, explain its evidentiary value, and state why the evidence could not have been filed in the trial court before the Court of Criminal Appeals filed and set the application for submission.
> * * *
> (b) If the Court of Criminal Appeals has received an Article 11.07 or 11.071 application from the district clerk of the county of conviction, but the Court has not yet filed and set the application for submission, the party must file in the Court of Criminal Appeals a motion to stay the proceedings pending the filing of the evidence in the trial court. In this motion, the party should describe the evidence the party intends to file and explain its evidentiary value.[27]

Two separate provisions of Rule 73.7 are implicated in this case. Because the case has been set for submission after remand from the Supreme Court, subsection (a)(2) applies. As set out above, subsection (a)(2) requires the party seeking to file new evidence to "describe the evidence the party intends to file, explain its evidentiary value, and state why the evidence could not have been filed in the trial court before the Court of Criminal Appeals filed and set the application for submission."

---

[27] TEX. R. APP. P. 73.7

The evidence Applicant filed also implicates subsection (b), because it appears to have been available while the case was pending in this Court before our original disposition. That subsection applies if the case has been forwarded to us but has not been set for submission. In that situation, the party seeking to submit new evidence must request a stay, "describe the evidence the party intends to file[,] and explain its evidentiary value."

Although we held the case for 30 days to give Applicant an opportunity to file materials with the clerk of the convicting court, that order did not exempt Applicant from Rule 73.7's informational requirements. It gave him extra time to comply with those requirements and allowed him to file in the trial court without filing a second motion before us. But pursuant to subsection (a)(2), he still needed to explain the evidentiary value of the new materials and state why they could not have been filed in the trial court before we set this case for submission.

His first item, the affidavit from Jenna Fechner, states that the victim's cell phone went off with an alarm titled "Wake-up Alarm" when the clock on the phone read 3:30 a.m. The affidavit was sworn in April 2023, ostensibly after the case was set for submission. But the affiant, an investigator for the Travis County District Attorney's Office, described her handling of the victim's cell phone in April 2021. If the District Attorney's Office notified Applicant with reasonable promptness about this information, then Applicant would have had plenty of time to file this evidence before we issued our January 2022 order denying relief. He could have filed it under subsection (b) of Rule 73.7 by filing a motion for stay, describing the new evidence, and ultimately having the new evidence filed with the trial court. Applicant does not now claim that the State failed to disclose this evidence before the issuance of our January 2022 order, nor has he offered any other reason why this affidavit could not have been filed in the trial court before we set the case for submission in March 2023.

Even if Applicant had explained why the affidavit could not have been filed earlier, he did not describe its evidentiary value. And even if we could look at the affidavit for that purpose, its evidentiary value is not apparent.

The second item of evidence is a declaration from Dr. Simon Ford, a molecular biologist and forensic DNA consultant, giving opinions regarding the paternity of the victim's son. Based on DNA testing from 2009, 2011, and 2013, Dr. Ford claimed that Fernando Garcia, the presumed father, cannot in fact be the child's father. Dr. Ford further claimed that "paternity cannot be ruled out with respect to another male individual whose DNA profile was typed by APD in 2013." Dr. Ford did not identify who this person was but claimed he was a suspect in the murder and was reported as a stalker of the victim. Dr. Ford acknowledged that one DNA locus point with respect to this suspect is inconsistent with paternity but stated that this discrepancy did not rule out paternity and also stated that more testing could shed further light on the issue of paternity. Attached to Dr. Ford's statement is a police report for the victim's death that references a potential suspect believed to have stalked the victim. The suspect's name in this copy of the report is blacked out.

We note that Dr. Ford's declaration is unsworn. Even if we overlooked that fact, Applicant does not explain why he could not have obtained and submitted this declaration from Dr. Ford earlier, before our 2022 order, since Dr. Ford's analysis is based on DNA testing conducted in 2013 or before. As with the Fechner affidavit, this seems to be evidence Applicant could have submitted under subsection (b) of Rule 73.7. Even if that deficiency is overlooked, Applicant does not explain the evidentiary value of this information, and even if we could look at Ford's declaration for such an explanation, the declaration does not explain the possible relevance of the paternity evidence.

The third and fourth items are declarations from Dr. Dan Krane and Professor Keith Inman,

who both submitted their opinions previously in this habeas action. Both declarations pointed to an NIST report issued in June 2021. Both discussed the relevance of the NIST report to probability estimates regarding DNA mixtures that were tested and to contamination and other reliability issues in the Austin Police Department (APD) lab. Both acknowledged that their habeas testimony came to conclusions that were consistent with the NIST report.

Dr. Krane's declaration makes his statements under the penalty of perjury, but Professor Inman's declaration is unsworn. Regardless, Applicant does not explain why he could not have obtained and submitted these declarations before our 2022 order, since the NIST report issued in June 2021. As with the previous two items discussed, this seems to be evidence Applicant could have submitted under subsection (b) of Rule 73.7. Even if that deficiency is overlooked, Applicant does not explain the evidentiary value of this information. And even if we could accept such an explanation from one of the expert's declarations, we see no such explanation. While the declarations indicate that the NIST report supports the chorus of other evidence on the general failures of the APD lab and on the inaccuracy of the probability estimates for DNA mixtures given in Applicant's case, those declarations do not explain how the NIST report would change the complexion of the case from what had been previously testified to.

The fifth item is a collection of law-enforcement records relating to the prosecution of Fernando Garcia-Sanchez for the crime of Aggravated Robbery on December 10, 2010. The latest of these documents appears to be dated February of 2011. Applicant does not explain why he could not have submitted these documents earlier, nor does he explain the significance of these documents.

### B. Arguments on *Certiorari*

"While the State's confession of error in a criminal case is important and carries great weight,

we are not bound by it."[28]   Although it is relatively rare, we have denied relief when both the convicting court and the State have recommended granting it.[29]  And we have done so in an at least one prior unpublished opinion without referring to the State's recommendation to grant relief.[30]

When we originally denied relief in this case, the State had abandoned its opposition to relief. That is not quite an affirmative agreement that relief should be granted, but it would perhaps have been better had we noted the specifics of the State's position in our unpublished order.  Nevertheless, we were aware of the State's position when the order was handed down.  Given the absence of any explanation for its change of position, the logical conclusion to draw is that the State had nothing to add to the convicting court's findings.

In its suggestion for reconsideration, the State clarified that it affirmatively agreed that Applicant was entitled to relief on his first two claims.  But we find hollow the State's claim at that time that it had "much to offer this Court in terms of analysis of the facts, the law, and the failures in the forensic science that supported the conviction."  At the time that the State filed its suggestion for reconsideration, it had missed at least two opportunities to offer its views.  First, the State could have offered those views when it first abandoned its opposition to relief.  After all, in the very

---

[28]  *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010).

[29]  *See Ex parte Covarrubias*, 665 S.W.3d 605, 609 & n.1 (Tex. Crim. App. 2023); *Ex parte Broussard*, 517 S.W.3d 814, 816 (Tex. Crim. App. 2017) (Denying relief and commenting, "The Harris County District Attorney's Office and habeas judge both recommended that we grant Broussard relief.  However, these recommendations do not automatically entitle an applicant to relief, especially if the legal theory underlying these recommendations is uncertain."); *Ex parte Bell*, 541 S.W.3d 746, 748 (Tex. Crim. App. 2017) (Alcala, J., dissenting) (observing that unpublished majority opinion denied relief despite the habeas court and the State recommending that relief be granted).

[30]  *Ex parte Bell*, No. WR-80,561-02, 2017 WL 781746 (Tex. Crim. App. March 1, 2017) (not designated for publication); *see Bell*, 541 S.W.3d at 748 (Alcala, J., dissenting) (same case).

document where it did so, it disagreed with a number of the convicting court's findings and explained the bases for those disagreements. Yet the State offered nothing in the way of additional analysis, authorities, or evidence to support granting relief. If the State had believed that the convicting court's analysis in support of relief was incomplete, it could easily have expounded on its position, especially in a document where it was already heavily criticizing the convicting court. Second, if the State had more to add when it requested reconsideration, it could have done so in that document, as support for its request for reconsideration, but it did not.

And to this day, despite our holding the case for thirty days, during which time the State could have proffered its "analysis of the facts, the law, and the failures in the forensic science that supported the conviction" that it claims it already had and that it claims was the basis for its change in position, the State has submitted nothing of the kind to this Court.

Before the United States Supreme Court, the State for the first time purported to set forth its view of why Applicant should obtain relief. But this view appears to be wholly dependent on the convicting court's findings, with the State citing those findings extensively in the background section of its *certiorari* response.[31] And while the State addressed its duty to do justice and to take corrective action when it discovers it has used false evidence, the State's reasoning on Applicant's actual claims appears to derive directly from the convicting court's findings.[32] The State offered nothing that was not already before us when we denied relief.

For instance, the State expressed the possibility of contamination as being of particular

---

[31] *See* State's cert. response at 3-18.

[32] *See id.* at 13, 16-18, 27-29.

concern,[33] but the convicting court extensively discussed contamination incidents in the lab (findings 18, 66, 88-95, 99), practices that carried a risk of contamination (findings 56, 78, 79, 115, 117-24), practices that undermined the ability to detect contamination risks (findings 67, 68, 83, 85,108-10, 183), and what it believed to be the risk of contamination in Applicant's case (findings 116, 129, 199-207). The State argued that non-DNA forensic evidence had shortcomings,[34] but the convicting court made these same arguments in finding 225. The State sought to minimize the effect of the girlfriend's testimony,[35] but the same contentions were made by the convicting court in finding 226. The State argued that the assailant being a stranger meant the prosecution had to rely heavily on DNA and other forensic evidence, but that contention was made by the convicting court in the introductory and "overview" sections of its findings.[36]

Also, the State's articulated, special concern about the possibility of contamination does not support the false-evidence claim Applicant brought to the Supreme Court. The evidence presented to the convicting court does not demonstrate that any evidence was contaminated in this case. It establishes, at most, a risk of contamination based on prior incidents and prevalent practices in the lab. And the parties have offered no new evidence on the issue of contamination. So the evidence before us regarding a risk of contamination has impeachment value but does not establish that the

---

[33] *See id.* at 13.

[34] *See id.* at 16-18.

[35] *See id.* at 15-16.

[36] Interestingly, in the same document in which it abandoned its opposition to relief, the State had objected to those sections of the convicting court's findings on the bases that they contain "no enumerated findings, citations to the record, or citations to legal authority" and "extend beyond the legal grounds remanded by the Court of Criminal Appeals."

DNA testing results were false.

Impeachment value of the evidence was relevant to Applicant's statutory "new science" claim and to his *Brady* claim, but neither of those claims was the subject of Applicant's *certiorari* petition. Even if they had been, they would not be properly before us on remand. The "new science" claim, based solely on a Texas statute, is not even a cognizable federal question. And the convicting court found *against* Applicant on the *Brady* claim, concluding that evidence of prior contamination incidents and contamination-prone practices was not material (findings 266-74, 292-94), and the State has never contested that determination.

The evidence that has been shown to be false relates to statistical probability estimates for certain DNA mixtures. But as we explained in our prior order, correctly revised estimates would still inculpate Applicant for some of the mixtures, and there were two single-source results unaffected by the flaws in mixed-sample interpretation. Especially in light of other evidence in the case, the somewhat weakened inculpatory inference from the DNA evidence did not create a reasonable likelihood of a different outcome.[37] The State points to what it sees as potential shortcomings in the other evidence, but those matters were before us in the habeas court's findings, and nothing the State has said in its petition changes our conclusion that, under the evidence as a whole, the inaccurate statistical estimates were not material, even when combined with the reliability concerns about the

---

[37] We have recently filed and set an application to determine whether "'knowing use' and 'unknowing use' of false testimony claims should employ different standards of materiality or, in at least some cases, be susceptible to different standards of harm." *Ex parte Thomas*, No. WR-94,420-01 (Tex. Crim. App. April 26, 2023) (not designated for publication). Having concluded that Applicant has failed to meet the "reasonable likelihood" standard articulated by the Supreme Court for "knowing use" claims, *see United States v. Bagley*, 473 U.S. 667, 678 (1985) ("reasonable likelihood" standard applicable to the prosecutor's knowing use of false evidence), we need not address in this case whether a standard less favorable to defendants would apply to the "unknowing use" claim before us.

handling of the evidence at the Austin lab.

We reaffirm our denial of relief.

Delivered: September 27, 2023

Publish